UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X

UNITED STATES OF AMERICA

       - against -                                                           11 Cr. 857 (WFK)

KEVIN CARDONA

               Defendant.
----------------------------------------------------------X

## MEMORANDUM OF LAW IN AID OF SENTENCING

LAW OFFICES OF ERIC FRANZ
Attorneys for Defendant Kevin Cardona
747 Third Avenue, 20th Floor
New York, NY 10017
(212) 355-2200

**TABLE OF CONTENTS**

| | | |
|---|---|---|
| I. | **PRELIMINARY STATEMENT**……………………..…………….. | 1 |
| II. | **DISCUSSION** | |
| | A. LEGAL STANDARD……………………………………….. | 1 |
| | B. THE OFFENSE…………………….………………………... | 3 |
| | C. THE PRE-SENTENCE REPORT RECOMMENDED GUIDELINES………………………………………………... | 5 |
| | D. MR. CARDONA'S HISTORY AND CHARACTERISTICS… | 5 |
| | E. MR. CARDONA'S SENTENCE WILL BE LONGER AND MORE DIFFICULT TO BEAR…………………………………………. | 8 |
| | F. MR. CARDONA WILL BE DEPORTED FOLLOWING HIS INCARCERATION AND THUS, THERE IS NO NEED FOR THE COURT TO IMPOSE A TERM OF SUPERVISED RELEASE… | 9 |
| III. | **CONCLUSION**……………………………………………..……… | 10 |

## I.

## **PRELIMINARY STATEMENT**

Mr. Cardona, a young man with no prior criminal convictions, comes before the Court as a product of his traumatizing and abusive past. A 20 year old young man from El Salvador, Mr. Cardona has been the subject of an underprivileged and physically abusive life for most of his childhood in El Salvador, and that life has followed him to New York City where he sought to fill the void of his lack of family guidance by associating with a group of individuals which led to his involvement in the instant offense, for which he suffers incredible remorse.

Attached at Exhibit A are letters from family and friends that provide a window for the Court into the kind of person Mr. Cardona is beyond the instant charges. The letters reveal a young man with significant promise. They provide evidence of a young man who, after he serves the sentence Your Honor will impose, will be able to reenter society, albeit a society outside of the United States, become a productive member of society, and make improvements upon his life.

For the reasons submitted below, we urge the Court to exercise leniency when imposing a sentence on Mr. Cardona.

## II.

## **DISCUSSION**

**A.   LEGAL STANDARD**

As this Court is undoubtedly aware, the United States Supreme Court decision in *United States v. Booker*, 543 U.S. 220 (2005), has reshaped the way a sentencing judge can impose a sentence. The sentencing court may consider the guideline range, as well as

1

any basis to depart from that range. However, the court is no longer required to impose sentence within that range. In fact, the federal sentencing guidelines are but one factor among several in determining an appropriate sentence. *Kimbrough v. United States*, 128 S.Ct. 554, 574 (2007). The guidelines are only the "starting point and initial benchmark…" *Id., citing Gall v. United States*, 128 S.Ct. 586, 596 (2007). It is the sentencing judge who has the advantage of familiarity with the details of the case and can best evaluate the import of the § 3553(a) factors. *Id., Kimbrough*, 128 S.Ct. at 574, *citing Gall*, 128 S.Ct. at 597.

In determining a sentence that is "sufficient, but not greater than necessary," the first of those factors the judge must consider is "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. §3553 (a)(1). Without a doubt, the breadth of this factor alone extends far beyond the guidelines and implores the sentencing judge to consider the unique circumstances and characteristics of the defendant in each case. A consideration of those characteristics, along with the remaining seven factors,[1] may render sentences that do not fit within the guidelines, yet are fair and meet the goals of sentencing set forth in §3553 (a)(2). *See United States v. Ovid*, 09 CR 216, slip op. 3 (EDNY, Oct. 1, 2010).

Therefore, the Court may not simply presume that the Guidelines range is reasonable. *Gall*, at 597. Rather, the Court must make an individualized assessment based on the facts presented. From its unique vantage, the Court may conclude that, despite the guidelines, "in a particular case, a within-Guidelines sentence is 'greater than necessary'

---

[1] The seven other factors are (1) the nature and circumstances of the offense; (2) the history and characteristics of the offender;(3) the need for the sentence imposed to reflect the goals of sentencing set forth in § 3553(a)(2); (4) the kinds of sentences available; (5) the Commission's policy statements; (6) the need to avoid unwarranted sentence disparities among similar defendants who commit similar crimes; and (7) the need to provide restitution to victims. *See* 18 U.S.C. §3553 (a).

2

to accomplish the goals of sentencing. . ." *Kimbrough*, 128 S.Ct. at 570, *citing* 18 U.S.C. § 3553(a). The not "greater than necessary" language of the federal sentencing statute incorporates the need for the sentence to "reflect the seriousness of the offense," "promote respect for the law" and "provide just punishment for the offense." 18 U.S.C. § 3553(a). Indeed, as the Supreme Court suggested in *Gall*, a sentence of imprisonment may not promote respect for the law if it appears unduly harsh in light of the real conduct and circumstances of the particular case. *Gall*, 128 S.Ct. at 599; *see also Rita v. United States*, 127 S.Ct. 2456, 2465 (2007) (observing that district court may consider arguments that "Guidelines sentence itself fails properly to reflect § 3553(a) considerations").

**B. THE OFFENSE**

As detailed in the Pre-Sentencing report, Mr. Cardona pled guilty on October 10, 2012 before Your Honor to Count 14 of a 17-count Indictment. PSR ¶ 1. Count 14 charges that between February 2011 and December 30, 2011, the defendant and others conspired to murder John Doe #3 for the purpose of gaining entrance and maintaining and increasing his position within MS-13, in violation of 18 U.S.C. § 1959(a)(5). *Id*.

Notably, and without trivializing Mr. Cardona's conduct, we note that in February, 2011, Mr. Cardona and his coconspirators agreed to try to kill John Doe #3, looked for him for a few days (in the beginning of February), and never again pursued the issue. *PSR at ¶12*. ("Despite the plan, the defendants never succeeded in attacking John Doe #3, as they could not find him. The Government advised that there do not appear to be subsequent attempts to find and attack John Doe #3"). Moreover, the primary reason Mr. Cardona and his coconspirators engaged in this unfortunate conduct is because John Doe #3 had previously slashed Mr. Cardona leaving a large scar across his face. *See PSR*

3

*at* ¶10. Your Honor will be able to see the scar left by John Doe #3 on Mr. Cardona's face at sentencing.

There is no excuse for Mr. Cardona's decision to seek revenge – only context. After having been attacked and slashed, Mr. Cardona was injured both physically and emotionally. He was understandably angry. Unfortunately, due to his illegal presence in this country, he did not feel comfortable seeking help from the authorities. Rather, he let his emotions get the best of him and along with his friends, decided that they should seek out the perpetrator and avenge Cardona's assault. As stated, the conspiratorial agreement was reached but the efforts to act upon it were temporally limited – once the adrenaline and anger subsided, so too did the efforts to locate and harm the man who had attacked and slashed Cardona.

Again, having reached the agreement in February, 2011 to try to kill John Doe#3, the crime was committed. However, this Court should consider the fact that Cardona's decision to avenge his slashing did not manifest itself in any harm to John Doe #3. Notably, while 10 months passed between the time of the reaching of the agreement and Mr. Cardona's arrest, the government's extensive wiretap evidence does not reveal any conversations after February, 2011, which demonstrate any further attempts to locate John Doe #3.

### C. THE PRESENTENCE REPORT RECOMMENDED GUIDELINES

The PSR provides for the following estimated offense level under the United States Sentencing Guidelines:

**COUNT 14 CONSPIRACY TO MURDER**

| | |
|---|---:|
| Base Offense Level(U.S.S.G. §2A1.5(a)) | +33 |
| Acceptance of Responsibility (U.S.S.G. §3E1.1(a) and(b)) | - 3 |
| **Adjusted Offense Level** | **30** |

Mr. Cardona is in Criminal History Category I and, thus, the adjusted offense level of 27 yields a guideline range of 97 to 121 months.

### D. MR. CARDONA'S HISTORY AND CHARACTERISTICS

As detailed above, a sentencing court must consider the defendant's history and characteristics when determining the appropriate sentence.

As stated in the PSR, Mr. Cardona was born in El Salvador to Francisco Cardona and Alma Rodriguez, who raised him until he was 6 years old, at which time they separated. PSR ¶ 51. Their separation, which was not explained to Mr. Cardona, caused him significant pain and trauma and ultimately led him to become involved with the wrong people in El Salvador. *Id*. According to the PSR, a significant portion of Mr. Cardona's childhood was spent "in the street," where he would get into fights and do what he could to feed himself, since his father would frequently be unable to provide for him and his brothers. *Id*. His fights on the streets reflected the physical abuse he received at home by his father and older brother, sometimes, as the PSR reflects, so badly that Mr. Cardona would need medical attention. *Id*. The defendant's mother eventually took him to the United States when Mr. Cardona was 15 years old. *Id.*

Upon arriving in the United States, Mr. Cardona was eager to learn English and turn his life around, but unfortunately, still an adolescent, and having only known and understood the environment on the streets, Mr. Cardona slid back into associating with an undesirable group of people. But for this association, we submit that Mr. Cardona would have never engaged in the instant offense conduct.

Mr. Cardona's mother, Alma Rodriguez, with whom he lived when he arrived in New York, recounts for the Court how Mr. Cardona tried to enroll in school, but, because he did not have his school records from El Salvador, he was rejected. *Ex*. A at 1. She writes:

> When he arrived in this country I wanted him to go to school. We went to register him at Thomas C. Giordano Middle School 45, located on Fordham Road in the Bronx, but because we didn't have his records from the school he had attended in El Salvador, it was impossible. So then he told me, Mom, I'm going to get a job and learn English in the evenings or weekends. I registered him at the New York Language Center school, located at 2450 Grand Concourse (at E. 188th Street), Bronx, NY 10458, not far from where we live. Afterwards he found a job in Queens, at a store where they sell a variety of things, it was a beauty supply store. He was happy with that job because he would work during the day and on Saturdays, he would go to that school to learn English. He worked at that store for about a year and a half, he got along very well with the owner of the store and with his co-workers.

*E*x. A at 1.

His mother explains that he attended English classes at night and worked during the day until he was attacked by John Doe #3. Ms. Rodriguez explains to the Court how the attack by John Doe # 3 affected Mr. Cardona's life. She writes:

> After that he suffered an assault in which some young men assaulted him and beat him in the face. For that reason, he couldn't go back to work and he lost his job. Then he spent most of his time at home watching movies, playing with his PlayStation, listening

6

>to music or drawing. He really liked to cook and talk and he was always in touch with his siblings and other relatives in El Salvador.

*E*x. A at 1.

Mr. Cardona's cousin, Jose R. Rodriguez, explains to the Court that he considers Mr. Cardona to be an "honest person." However, it is undeniable that Mr. Cardona, only 20 years of age, is in large part a product of his past. Mr. Rodriguez provides insight for the Court as to Mr. Cardona's family life childhood. He writes:

>I think a very important fact that affected Kevin very much was the separation from his mother, my Aunt Dinora, who left the country when he was still very little. And well, communication between them was kind of complicated because the relationship between his parents has not been very good. For that reason, communication between mother and son was infrequent. Lately, when they meet up in this country (my Aunt Dinora and Kevin), their communication has been very difficult, because as far as I understand it, there is some type of resentment towards her on his part.

*E*x. A at 2.

Similarly, Ms. Lucia Hernandez, Mr. Cardona's aunt, echoes for the Court Mr. Cardona's lack of guidance and love as a child that may account for his poor decisions and the instant offense. She explains that Mr. Cardona "is a good person who lacked affection and understanding." *E*x. A at 3. She goes on to state that "[h]e is honest and helpful, a good guy." *Id*.

With such an unfortunate upbringing, it is not surprising that Mr. Cardona sought to fill the void left by his broken home and began associating with his codefendants. Unfortunately, this association led to his engagement in the instant offense conduct.

7

### E.  MR. CARDONA'S SENTENCE WILL BE LONGER AND MORE DIFFICULT TO BEAR

While the Sentencing Reform Act provides that the Bureau of Prisons "shall, to the extent practicable, assure" that a prisoner spend some portion of the last 10% of the term of imprisonment under conditions that will allow the prison to prepare for "re-entry into the community," Mr. Cardona is ineligible for reassignment to a minimum security facility such as a halfway house because he is a deportable alien and cannot show that he had in the United States (a) at least five years of domicile, (b) strong family and community ties, and (c) a history of stable employment. *United States v. Restrepo*, 999 F.2d 640, 645 (2d Cir. 1993). Nor, will Mr. Cardona be entitled to participate in any federal prerelease programs. *See Lartey v. U.S. Dept. of Justice*, 790 F.Supp. 130 (W.D.La.1992) (Statute granting prisoners the right to participate in prerelease programs does not apply to deportable aliens.). As such, Mr. Cardona will not be afforded the privilege of being transferred to a lower security facility towards the end of his sentence and will therefore be forced to endure a more arduous sentence than similarly situated inmates who are citizens of the United States.

Additionally, rather than be transferred to a minimum security facility, as would likely occur were Mr. Cardona a United States citizen, he will be held two months longer as a result of the immigration detainer. *United States v. Restrepo*, 999 F.2d 640, 646 (2d Cir. 1993) ("This additional period of incarceration, the district court found, can average 59 days."). Therefore, in addition to being denied a transfer to halfway house, he will likely serve additional time in the higher security facility than another similarly situated inmate who is a United States Citizen.

8

Put simply, Mr. Cardona's prison term will likely be longer and more difficult to bear because of the fact that he is a deportable alien. We submit that the Court may take these facts into consideration in determining an appropriate sentence for Mr. Cardona.

**F. MR. CARDONA WILL BE DEPORTED FOLLOWING HIS INCARCERATION AND THUS, THERE IS NO NEED FOR THE COURT TO IMPOSE A TERM OF SUPERVISED RELEASE.**

U.S.S.G. § 5D1.1(c) generally discourages district courts from imposing supervised release on aliens "who likely will be deported after imprisonment." *See* U.S.S.G. § 5D1.1(c) ("The court *ordinarily* should not impose a term of supervised release in a case in which supervised release is not required by statute and the defendant is a deportable alien who likely will be deported after imprisonment." (emphasis supplied)).

Here, supervised release is not required by statute. *See PSR at ¶75* ("The Court *may* impose a term of supervised release of not more than three years on Count 14. 18 U.S.C. § 3583(b)(2)") *emphasis added.* Notably, supervised release is not required as evidenced by the use of the word "may" in the statute.

Further, Mr. Cardona has no prior criminal history and due to his illegal presence in the United States, his deportation is virtually certain. An immigration detainer has already been lodged against Mr. Cardona. *See PSR at ¶49.*

When determining if supervised release should be imposed on a defendant who will likely be deported, the Second Circuit recently explained in *United States v. Alvarado*, 720 F.3d 153, 158 (2d Cir. 2013) that:

> […] although imposing a term of supervised release on aliens "who likely will be deported after imprisonment" is "ordinarily" discouraged pursuant to Section 5D1.1(c), the Guidelines commentary specifies that a district court should consider

9

imposing supervised release on such defendants if it would provide "an added measure of deterrence and protection." *Id.; see also United States v. Valdavinos–Torres,* 704 F.3d 679, 693 (9th Cir.2012); *United States v. Dominguez–Alvarado,* 695 F.3d 324, 329 (5th Cir.2012) ("To be sure, supervised release should not be imposed absent a determination that supervised release would provide an added measure of deterrence and protection based on the facts and circumstances of a particular case.").

Here, we respectfully submit that there is no need for added deterrence or protection concerning Mr. Cardona. As such we respectfully submit that this Court should not impose a term of supervised release upon Mr. Cardona.

### III.

### CONCLUSION

For all the foregoing reasons, we respectfully request this Court impose a sentence that is below the advisory sentencing guideline range, and is sufficient, but not greater than necessary. As such, we ask that the Court sentence Mr. Cardona to the most lenient sentence it deems appropriate.

Dated:   New York, New York
         September 13, 2013

_____
Eric Franz (EF 3268)